IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RONALD SUBER, | § | |
| | § | |
| Defendant Below, | § | No. 392, 2023 |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2108011433A (K) |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: October 8, 2025
Decided: January 15, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **VACATED and REMANDED**.

Patrick J. Collins, Esquire, COLLINS PRICE WARNER WOLOSHIN, Wilmington, Delaware, *for Appellant Ronald Suber*.

John R. Williams, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Dover, Delaware, *for Appellee State of Delaware*.

**SEITZ**, Chief Justice:

A Superior Court jury found Ronald Suber guilty of first-degree murder and related charges for killing Anna Hurst. The court sentenced Suber to life in prison. On appeal, Suber argues that the State improperly relied on indirect hearsay evidence to secure his convictions. The State concedes the error, and that it violated Suber's confrontation rights under the United States Constitution.

But Suber's defense counsel failed to object at trial to the improper questioning. Thus, we review Suber's constitutional claims under our plain error standard of review. The State contends that under plain error review, Suber's convictions should stand because the indirect hearsay was not prejudicial to Suber's substantial rights.

After careful review, we have concluded that Suber has shown that the constitutional error was so clearly prejudicial to his substantial rights as to jeopardize the fairness and integrity of the trial process. Thus, we vacate Suber's convictions and remand for further proceedings consistent with this opinion.

I.

A.

The evidence at trial showed that Ronald Suber, Tori Balfour, Brian May, and Anna Hurst worked together to steal catalytic converters from cars. During one theft on August 19, 2021, the car's owner called the police after seeing the four of them

2

trying to remove a catalytic converter from his car.[1]  The police pursued the getaway car as the four suspects fled the scene.  As the getaway car slowed down, a man and woman jumped out and ran.  The man, identified as May, escaped.  The woman, identified as Hurst, was caught by police and later confessed to the catalytic converter thefts.  The driver, identified as Suber, and passenger, identified as Balfour, escaped in the car.

On August 20, Balfour traded cars with her cousin, who owned a 2013 Chevrolet Impala with dark tinted windows.  Balfour testified that she switched cars because Suber wanted a car with tinted windows.  She also testified that Hurst and May were trying to meet her and Suber.  According to Balfour, Suber was unhappy after receiving a call telling him that Hurst had been arrested.  Nicole Jackson – the mother of Suber's child – testified that she received "paperwork" in August that referred to Balfour and the words "catalytic converter."[2]

---

[1] Balfour testified that the theft took place on August 17, 2021.  App. to Opening Br. at A0576 [hereinafter A_] (Balfour's Testimony).  The arresting officer testified that the date was August 19, 2021.  A0061 (Patrolman Slaughterman's Testimony).  We use August 19 as the date of the incident for purposes of the appeal.

[2] A0771 (Jackson's Testimony).  The "paperwork" was probably an arrest warrant for Suber. A0767 ("We have a copy of *what we believe* that paperwork to be . . . ." (emphasis added)). The jury was not told about the content of the paperwork to avoid confrontation clause issues.  A0772 ("The statements that the State seeks to elicit are the contents of an arrest warrant, which was promulgated by statements made by Ms. Hurst and/or Mr. May, neither of whom are in court to testify and be confronted by Mr. Suber.").

Balfour testified that Suber agreed to meet with May and Hurst. Balfour stated that she and Suber picked up May and Hurst at a Royal Farms convenience store. Video surveillance from the store showed May and Hurst get into Suber's borrowed Impala at 12:02 AM on August 21. According to Balfour, Suber told May and Hurst during the drive that he was unhappy "[t]hat things were said, pretty much told," to the police.[3]

Balfour testified that they stopped by a cornfield. Because Balfour had turned on the child door locks, Suber had to open the rear passenger door for May and Hurst. Balfour noticed Suber wearing a blue glove and holding a golden gun pointing at May and Hurst. Balfour heard one shot and noticed Hurst drop to the ground. Balfour then saw May run into the cornfield. Balfour testified that Suber followed, shooting twice at May.

After that, Balfour watched Suber walk to Hurst's body and then to the car. Balfour said that Suber asked her for a sharp object. After saying that she did not have one, Balfour watched Suber open the trunk and then walk into the cornfield. She no longer saw Hurst. Balfour left the car, closed the trunk, and then waited in the car. Balfour testified that Suber was still wearing blue gloves when he returned and sat in the front passenger seat.

---

[3] A0598 (Balfour's Testimony).

4

According to Balfour, Suber told her to drive to his nearby cousin's house. During the drive, she heard Suber say on the phone that he "killed a white girl."[4] On a different call, she heard him say, "If you see the white boy, take him out."[5] When Suber returned after entering the house, she saw that he had changed clothes. She testified that they drove to Philadelphia. On the way, she watched him toss his previously worn clothes and gloves out the window at different times in the trip. Video footage from the Dover Toll Plaza showed the Impala heading north on Route 1 at 1:51 AM on August 21. Video footage from the Biddle's Toll Plaza showed the same car traveling north at 2:25 AM.

Balfour testified that they returned to Suber's cousin's house in Philadelphia in the early morning while it was still dark. She noticed his handgun during the stay. Suber's cousin, Taji Turner, testified that Suber and a woman stayed with him in "late" August.[6] He did not know what car Suber drove, but he noticed Suber had a golden handgun.

The morning of August 21, the State Police received two emergency calls. One call came from a local resident who had heard May knocking on his back door. The resident testified that May claimed, "[t]he bad man shot me."[7] He also testified

---

[4] A0617.

[5] A0618.

[6] A0525 (Turner's Testimony). Turner also testified that he did not know the exact date of the visit.

[7] A0313 (Srygley's Testimony).

5

that May claimed he fled after "she had been shot."[8] The other call came from a farmer who discovered Hurst's body in his cornfield.

Detective Mark Ryde visited the cornfield and the callers. He also took a statement from Jeanine Thomas about what she had heard the previous night while sitting in her garage. Thomas testified that she heard someone say "no, no, no" and "get out, get out, get out."[9] She claimed that a female voice said, "pull her by the hair."[10] She also heard "my girls need me. Her mom has money, would pay."[11] Finally, Thomas heard two or three gunshots.

Detective Ryde and another detective visited the hospital to interview May. Ryde asked May to review a photo line-up. May identified Suber as his shooter. After the interview, Detective Ryde obtained a warrant for Suber's arrest charging him with murder, attempted murder, and several firearms offenses. On August 28, Detective Ryde arrested Suber and Balfour. A week later, May disappeared from the hospital.

Hurst's autopsy revealed that she died from a combination of gunshots and blunt force trauma to the head. Hurst's DNA was found on a towel in the Impala. Her DNA was also found on plastic molding on the trunk of the car. Suber's DNA

---

[8] A0318.

[9] A0395 (Thomas's Testimony).

[10] *Id.*

[11] A0396.

was found on the interior of the driver's door – though cross-examination revealed that the DNA could have been transferred there by someone who touched Suber. Aside from this, the police found no latent fingerprints. Three spent bullet casings and two live rounds were recovered at the crime scene. Firearms testing showed that the ammunition was 0.45-caliber. The police did not recover a firearm that matched the ammunition.

B.

A grand jury indicted Suber for first degree murder, attempted first degree murder, possession of a firearm during the commission of both felonies, tampering with a witness, and conspiracy in the second degree. Balfour was indicted for tampering with a witness and conspiracy in the second degree. Just before trial, Balfour agreed to plead guilty to conspiracy. In exchange for the State's agreement to recommend no prison time, Balfour agreed to cooperate in Suber's prosecution. The court deferred sentencing Balfour until after Suber's trial.

A material witness warrant was issued for May, but he did not appear and could not be located. At trial, the State questioned Detective Ryde about May's hospital interview. After asking the Detective about May's condition, the State asked:

> State: Without telling me anything he said, was [May] shown a lineup as part of that interview?
>
> Detective Ryde: Yes.

7

State: Without telling me anything he said, did he identify someone in that lineup?

Detective Ryde: Yes.

State: Were subsequent interviews with Brian May conducted?

Detective Ryde: Yes.

State: Who conducted those follow-up interviews?

Detective Ryde: I did.

State: Were all of those interviews recorded?

Detective Ryde: Yes.

State: As a result of your interview in [sic] the photo lineup, did you get an arrest warrant?

Detective Ryde: Yes.

State: Who was the arrest warrant for?

Detective Ryde: Ronald Suber, Junior.

State: What were the charges?

Detective Ryde: Murder First Degree, Attempted Murder First Degree, Possession of a Firearm During the Commission of a Felony, two counts of that, and Possession of a Firearm by a Person Prohibited.[12]

The defense did not object to the testimony. The State also questioned the detective that compiled the photo line-up and the detective that showed May the line-

---

[12] A0374 (Detective Ryde's Testimony).

up.[13]  Once again, the defense did not object to the testimony.  Before releasing the jury to deliberate, the Superior Court gave an accomplice-testimony instruction.

The jury found Suber guilty of all charges.  On November 16, 2023, the court sentenced Suber to Level V custody for the remainder of his life on the murder conviction.  For the remaining offenses, the court sentenced Suber to seventy years at Level V, followed by eight years of probation.

II.

On appeal, Suber argues that Detective Ryde's testimony should have been excluded as indirect hearsay evidence.  According to Suber, without May available to testify about the line-up, the State elicited indirect hearsay evidence by implying that May picked Suber out of the line-up – a violation of Suber's constitutional right to confront witnesses testifying against him.  Although defense counsel did not object to Detective Ryde's line-up testimony, Suber argues that the error was plain and prejudiced his right to a fair trial.

The State has conceded the error.  It acknowledges that relying on indirect hearsay testimony violated Suber's constitutional right to confront witnesses

---

[13] A0853 (Detective Grassi's Testimony) (testifying he compiled the line-up); A0863–64 (Detective Yeich's Testimony) (testifying he showed May the photo line-up while Detective Ryde left the room).

testifying against him.[14]  According to the State, however, because defense counsel did not object, we should review for plain error.  The State argues that given the other evidence of guilt, Suber cannot show that the error jeopardized the fairness and integrity of the trial process, and his convictions should stand.

A.

At the outset, we must consider the standard of review.  To ensure efficiency and finality in litigation, Delaware Rule of Evidence 103 requires timely objections to evidence during trial proceedings.[15]  Through timely objections, the trial judge can consider issues before they ripen into appellate issues.[16]  The opposing party also has a chance to weigh in on objections before appeal.  As we have held:

> Opponents should have a fair chance to address arguments at the trial court. It is prudent for the development of the law that appellate courts have the benefits that come with a full record and input from learned trial judges. Thus, fair presentation facilitates the process by which the

---

[14] Answering Br. 18 ("In this direct appeal new counsel for Suber argues that Ryde's testimony about getting an arrest warrant for Suber after the non-appearing witness May viewed a photo lineup at the hospital is indirect hearsay that violates Suber's rights under the Sixth Amendment Confrontation Clause.  Suber is correct.  Ryde's testimony is indirect hearsay.").

[15] Del. R. Evid. 103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context"); *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) ("To expedite finality and promote economy in litigation, Rule 103 . . . requires the parties to raise timely objections to evidence in the trial court or risk losing the right to raise evidentiary issues on appeal.").

[16] *Shawe v. Elting*, 157 A.3d 152, 169 (Del. 2017) ("It is prudent for the development of the law that appellate courts have the benefits that come with a full record and input from learned trial judges."); *Alexander v. Cahill*, 829 A.2d 117, 129 (Del. 2003) ("Rule 103 . . . requires that claims of error be predicated upon a ruling.  If a party makes the tactical decision to object, the trial judge must . . . definitively rule thereby preserving both the objection and the basis for the ruling on the record.").

application of rights in an individual case affects others in other cases and society in general.[17]

Supreme Court Rule 8 provides that "[o]nly questions fairly presented to the trial court may be presented for review." A question is fairly presented when the trial court "understands it is an argument that must be considered and decided"[18] or "understood and addressed the argument being made on appeal."[19] Rule 8 does, however, offer an escape hatch that allows the Court to review an unpreserved argument "when the interests of justice so require."

A limited universe of errors qualify for review under the interests of justice exception without further inquiry – for instance, jurisdictional issues.[20] But the interests of justice exception is just that – an exception. The interests of justice exception is extremely limited and reserved only for plain errors that affect a party's substantial rights.[21]

---

[17] *Shawe*, 157 A.3d at 169.

[18] *In re Oracle Corp. Deriv. Litig.*, 339 A.3d 1, 18 n.76 (Del. 2025).

[19] *In re Tesla, Inc. Deriv. Litig.*, __ A.3d. __, 2025 WL 3689114, at *9–10 (Del. Dec. 19, 2025).

[20] *Imbragulio v. Unemp. Ins. Appeals Bd.*, 223 A.3d 875, 878 (Del. 2019) ("[A] litigant may raise a court's lack of subject matter jurisdiction at any time in the same civil litigation, 'even initially at the highest appellate instance.'" (citation omitted)).

[21] Sup. Ct. Crim. R. 52(b) ("*Plain error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *see also* Del. R. Evid. 103(e) ("Taking Notice of Plain Error. A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved."); *Isaac v. Politico LLC*, 346 A.3d 103, 126 (Del. 2025) ("Th[e] [interests of justice] exception to Rule 8 is . . . reserved for instances where 'the trial court made a plain error[.]'" (citations omitted)).

Plain errors are "material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[22] To consider issues under plain error review, four questions must be answered.

First, is the record adequate to consider whether plain error occurred? As we held recently in *Swanson v. State*, when the failure to object to the admissibility of evidence "effectively precluded the State from establishing an evidentiary record," we do not engage in plain error review. [23]

Second, was there an error? When a party has knowingly and intelligently waived a right – such as a procedurally proper guilty plea or strategic decision not to object – we cease further review.[24] The State bears the burden to prove a knowing and voluntary waiver.[25] Furthermore, we will "indulge in every reasonable presumption against waiver[.]"[26]

---

[22] *Wainwright*, 504 A.2d at 1100.

[23] *Swanson v. State*, __ A.3d __, 2025 WL 3778943, at *3 (Del. Dec. 31, 2025); *see also Johns v. State*, __ A.3d. __, 2025 WL 3637521, at *8 (Del. Dec. 16, 2025) (declining to review as-applied constitutional challenge when record was insufficient).

[24] *Purnell v. State*, 254 A.3d 1053, 1101 (Del. 2021) ("Waiver is the voluntary and intentional relinquishment of a known right.") (quoting *Daskin v. Knowles*, 193 A.3d 717, 725 (Del. 2018)); *Wright v. State*, 980 A.2d 1020, 1023 (Del. 2009) ("The plain error standard of appellate review is predicated upon an assumption of oversight" and where "the record reflects that the decision not to object at trial was a 'deliberate tactical maneuver by' defense counsel and did not result from oversight, then that action constitutes a true waiver.").

[25] *Purnell*, 254 A.3d at 1101.

[26] *Flamer v. State*, 490 A.2d 104, 113 (Del. 1983).

Third, if the error was forfeited and not waived,[27] was the error plain?  Plain errors are errors under current law.[28]  An error cannot be plain "if neither this Court nor any other binding authority (which . . . includes the United States Supreme Court) has definitively ruled on the issue, and if other courts are divided."[29]  We assess whether the error "is apparent from the vantage point of the appellate court in reviewing the trial record, not whether it was apparent to the trial court in light of then-existing law."[30]

Fourth, did the error adversely affect the substantial rights of the party?  To affect the substantial rights of a party, the error must "be so clearly prejudicial as to jeopardize the fairness and integrity of the trial process."[31]  Some structural constitutional errors are so prejudicial that prejudice to the fairness and integrity of

---

[27] Waiver is often used to describe forfeiture, but the two are distinct concepts.  As explained above, waiver is the knowing and intelligent waiver of a right.  Forfeiture, on the other hand, "is the failure to make the timely assertion of a right." *Purnell*, 254 A.3d at 1101 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).  Waived issues are not reviewed for plain error.  A forfeited error can lead to reversal but is subject to plain-error review.

[28] *Johnson v. State*, 813 A.2d 161, 165 (Del. 2001).

[29] *Johns*, 2025 WL 3637521, at *9.

[30] *Capano v. State*, 781 A.2d 556, 663 (Del. 2001) ("'[I]t is enough that an error be "plain" at the time of appellate consideration,' even when 'the law at the time of trial was settled and clearly contrary to the law at the time of appeal'" (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997))); *see also Henderson v. United States*, 568 U.S. 266, 278 (2013) ("[P]lain error review is not a grading system for trial judges.  It has broader purposes, including in part allowing courts of appeals better to identify those instances in which the application of a new rule of law to cases on appeal will meet the demands of fairness and judicial integrity.").

[31] *Johnson*, 813 A.2d at 165.

the trial process is presumed.[32] But for other constitutional errors reviewed for plain error, "there must be 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'"[33] The burden to show prejudice to substantial rights rests with the defendant.[34]

B.

To meet his plain error burden, Suber must show that (1) the record is adequate to review his claim, (2) an error occurred, (3) the error is plain, and (4) the error adversely affected his substantial rights by jeopardizing the fairness and integrity of the trial process. At trial, the State relied on testimony from Detective Ryde which revealed that after May was shown a photo line-up, police issued a warrant for Suber

---

[32] Structural errors are defects which "affect the 'entire conduct of the [proceeding] from beginning to end.'" *Greer v. United States*, 593 U.S. 503, 513 (2021) (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). "The 'highly exceptional' category of structural errors includes, for example, the 'denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt.'" *Id.* (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)). These errors are "'subject to automatic reversal' on appeal." *Neder v. United States*, 527 U.S. 1, 8 (1999).

[33] *Greer*, 593 U.S. at 507–08 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 134–35 (2018)) (interpreting Federal Rule of Criminal Procedure 52(b), the counterpart to Superior Court Rule of Criminal Procedure 52(b)); *see Johnson v. State*, 342 A.3d 1157, 1164–65 (Del. 2025); *Delgado v. State*, 341 A.3d 512, 2025 WL 1517305, at *5 (Del. May 28, 2025) (TABLE); *Reyes v. State*, 315 A.3d 475, 497 (Del. 2024), *Hastings v. State*, 289 A.3d 1264, 1271 (Del. 2023); *Buckham v. State*, 185 A.3d 1, 19–20 (Del. 2018); *Morales v. State*, 133 A.3d 527, 532 (Del. 2016); *Green v. State*, 147 A.3d 748, 2016 WL 4699156, at *3 (Del. 2016) (TABLE). To the extent that *Howell v. State*, 268 A.3d 754, 773 (Del. 2021) and *Heald v. State*, 251 A.3d 643, 655 (Del. 2021) might be read to impose a different standard, we hew to the federal standard and whether there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

[34] *Williams v. State*, 98 A.3d 917, 922 (Del. 2014) ("[F]or plain error, 'it is the defendant who bears the burden of persuasion with respect to prejudice.'" (quoting *Bullock v. State*, 775 A.2d 1043, 1055 n. 43 (Del. 2001) (Veasey, C.J., concurring)).

14

for murder, attempted murder, and firearm offenses. As the State concedes, this testimony led the jury to believe that May identified Suber as the shooter, even though May never testified and was not subject to cross examination.

Given the State's concession that an error occurred that violated Suber's constitutional right to confront witnesses offering evidence against him, the first three plain-error inquiries are satisfied. The remaining question is whether Suber can establish that the State's admitted constitutional error jeopardized the fairness and integrity of his trial such that there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different.[35] The State contends that Suber cannot meet that burden because the indirect hearsay evidence was cumulative of other evidence of Suber's guilt, including Balfour's testimony.

Admittedly, there was admissible evidence to support Suber's guilt. A resident testified that May claimed he had been shot by a "bad man," that a woman

---

[35] In their briefs the parties frame the prejudice inquiry as whether the indirect hearsay was harmless beyond a reasonable doubt. *See* Opening Br. 36–41; Answering Br. 21. But harmless error analysis applies to errors that were preserved in the trial court. *See Kirkley v. State*, 41 A.3d 372, 376 (Del. 2012) (The standard of review "depends on whether the issue was fairly presented below. If defense counsel raised a timely objection to the conduct at trial, or if the trial judge considered the issue *sua sponte*, then the conduct is reviewed for harmless error. Otherwise, the conduct is reviewed for plain error."). If the trial court erred when it overruled an objection involving a constitutional claim, the court must decide whether the error was harmless beyond a reasonable doubt. *McGuiness v. State*, 312 A.3d 1156, 1199 (Del. 2024) ("When an error relates to a constitutional right, we must determine if it was harmless beyond a reasonable doubt."). If an objection was not made, the court reviews for plain error. *Saavedra v. State*, 225 A.3d 364, 372 (Del. 2020) (if "a timely objection was not made and the judge failed to address the conduct *sua sponte*, we engage in a plain error analysis").

had also been shot, and that May had fled through a cornfield.[36] A farmer testified that he found a woman (later identified as Hurst) dead in his cornfield.[37] Turner observed that Suber carried a gun. Balfour testified that Suber shot Hurst and May. Hurst's blunt-force trauma wounds corroborate Balfour's testimony that Suber asked for a sharp object. And video evidence showed the movement of the Impala around the time of the murder picking up May and Hurst and later driving towards Philadelphia.[38]

We do not, however, treat Constitutional violations lightly when the State relies on the improperly admitted evidence to identify the perpetrator of a murder. The State called three detectives to elicit the indirect hearsay evidence.[39] May was a first-hand witness. The State used the indirect hearsay evidence to lead the jury to conclude that May identified Suber as the shooter. Without the line-up identification testimony, the State would have had to rely solely on Balfour as the only other first-hand witness who identified Suber as the shooter.

---

[36] A0313–18 (Srygley's Testimony).

[37] A0325–31 (Dixon's Testimony).

[38] A0885 (Detective Ryde's Testimony) (testifying video showed Impala picking up May and Hurst at midnight); A0897 (testifying video showed the Impala heading north at 1:51 AM, and again at 2:25 AM, on the night of the murders).

[39] A0394 (Detective Ryde's Testimony); A0853 (Detective Grassi's Testimony); A0863 (Detective Yeich's Testimony).

Much of the incriminating evidence came from Balfour. But Balfour was part of the catalytic converter theft ring and an accomplice to the shooting. She received a plea deal in exchange for her cooperation. As an accomplice to the crime, the jury was instructed to examine her testimony "with more care and caution than the testimony of a witness who did not participate in the crime charged."[40] Further, the court told the jury that "[t]his rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplice's accusation that this Defendant participated in the crime."[41] In other words, Balfour's credibility was highly dependent on corroboration. That corroboration was found through indirect hearsay evidence that May identified Suber has the shooter. Although not a certainty, we conclude that there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

## III.

The judgment of the Superior Court is vacated and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.

---

[40] A1129 (Charge to the Jury).

[41] A1129–30.

17